Case is number 23-1537, Allied Painting and Decorating against International Painters and Allied Trades Industry Pension Fund. Mr. Tucker. Good morning, Your Honors. I'd like to reserve two minutes for rebuttal, please. Granted. May it please the Court, my name's Richard Tucker. I'm counsel for the Appellant International Painters and Allied Trades Industry Pension Fund, or more briefly, the fund. This is an ERISA withdrawal liability case where the fund assessed withdrawal liability against Allied Painting and Decorating Inc. and other entities that were under common control with it pursuant to 29 U.S.C. Section 1383 B.2. Section 1383 B.2 provides the criteria for determining whether there has been a withdrawal with respect to employers that are engaged in the building and construction industry. And there's a presumption under the statute that when you assess withdrawal liability, that that's correct, the burden shifts to the employer to show why it's not correct. That's exactly right. And here in this case, one of the challenges or problems was that the fund waited a remarkably lengthy period of time in order to assess withdrawal liability, correct? That's correct. And that was one of the defenses that Allied raised in front of the arbitrator. It said that it had been, that there was undue delay and prejudice to it because of that delay. Right. The arbitrator found undue delay but no prejudice. That's correct. And one of the things I'm wrestling with is the statement in Bay Area Laundry. After the court made its holding on the statute of limitations issue, the court said in rejecting the policy or speaking to some of the policy considerations that were argued by the losing party, writing for the unanimous court, Justice Ginsburg wrote that we're not too worried about that because the employer may bring a laches defense. Right. Okay. Well, one of the things I don't understand is whether the laches defense is always an issue in these cases because the statute doesn't even mention laches. The statutory language just requires that the fund provide notice, you know, without unreasonable delay. Right. That's correct. But that decision by the Supreme Court, the Bay Area Laundry, said that the way to raise the question of whether or not it was done as soon as practical was by asserting a defense of laches. Well, it didn't say the only way. It said may. Right. So I'm wondering why. I know some courts have said that you have to apply this laches analysis, but I'm wondering if that's consistent with the statutory language. Because I don't read into the as soon as practicable language. That doesn't carry with it a requirement of prejudice. That just speaks to what is as soon as practical means one thing. Laches means something different because laches requires prejudice. Exactly. Laches does require prejudice. I'm not aware of any court that has not said that the way you do this is through a defense of asserting a defense of laches. Are you aware of any authority where the court has looked at the meaning of the statute? I'm sorry? Are you aware of any authority where the court has looked at the meaning of the statute to determine whether the word prejudice should be read into it? I think the answer is no. Right. I mean, I understand the point of saying, well, Bay Area talks about laches. But what Bay Area was was a case about statute of limitations. When does it accrue? When does it toll? And part of what the court seems to be concerned about there is the possibility that a lengthy period of notification of liability would extend the otherwise six year application of the statute of limitations to six, eight, ten, whatever. That obviously creates burdens on behalf of the employer. And what the court says is, well, if it takes a while for the claim to be filed, it may be that you can address that through a laches defense. That's a common law remedy. And of course, Congress didn't seek to supersede it. But it doesn't answer the question of what happens if you don't, as in this case is the arbitrator fine, provide your notice of liability as soon as practical. It seems at that point you're not in Bay Area. You're just within fit. You just haven't met the elements of an affirmative claim under the statute. I'm not sure I understood your question. I mean, it's the statute is is is six years, but it starts to run at the point where the employer fails to make the first payment under a notice that it is received from the fund. Assuming that. Right. Assuming that that's. But you also have to provide that notice as soon as practical. Right. As a what? As soon as practicable. Oh, as soon as practicable. Yes, that's. Yes. So what happens if you don't provide it as soon as practical? What? Well, then then the employer brings a defense of laches in accordance with what the court said in Bay Area. I guess what we're teasing out is this one way to read Bay Area is to say there's always don't worry about our holding here today in Bay Area because we've all you'll always have a laches defense eventually. But I think what my colleagues are asking about is, OK, that's one way to read Bay Area. But there's another question and it might be a bit of a separate question, which is what just happens if you don't give the notice of withdrawal liability as soon as practicable? Why are we necessarily going to read as soon as practical as saying laches? Shouldn't we shouldn't we give shouldn't we give as soon as practicable its own statutory meaning, recognizing that maybe as soon as practicable is one layer to to to motivate a prompt notice and laches is another separate defense. But I guess the nub of these questions is why have we combined as soon as practical understanding to mean only laches? You get that now maybe other other courts have died, but we haven't weighed in on that. You haven't weighed in on the courts that have weighed in on it. Does that do say you assert the defense of laches and lachey area laundry because Bay Area laundry? Yeah. So really, I guess our our our question is whether those courts have over read or misread Bay Area laundry. Yes. And I'm but I'm not I'm not aware of any court that has, in fact, said that you don't use laches. And the courts that have said laches, you know, there are a couple of different ones, district courts. Is it a smattering? Is it is it five or six courts or are there are the cases legion where? No, they're not. I'm not saying they're legion, but all of the cases that I've found and I think they're cited in my brief. All say you apply laches and laches requires the showing of prejudice. But I think but one answer is you can apply laches. I don't think a reading of the statute says would be inconsistent with Bay Area. I think all Bay Area says is that laches is available. And then I think the thought would be, should we read Bay Area to say that laches is the exclusive defense? And and versus as soon as practical, providing its own separate way. And so I get it. Latches will always be. I don't think anyone's going to try to upset that apple cart from Bay Area that latches is somehow unavailable. The question is, do you have almost two bites at this apple, which would be as soon as practical for the notice? And then the overall time that the action was commenced, latches, which latches doesn't come from Bay Area. Latches comes from a common law of the United States and England and everywhere else. Right. And all Bay Area could argue be doing is saying, well, Congress didn't seek to override a common law defense. It would have to somehow expressly preempted that. So it didn't. So don't worry. You could always assert as a defense to a long delayed claim the defense of latches. But that doesn't answer the meaning of what does as soon as practical will mean when it doesn't have a qualifier as prejudicial. I would suggest that if the opinion in Bay Area Laundry had felt that there was also a separate basis for bringing a claim that it would have said so. And it didn't. The only the only resolution of this issue that was recognized was the bringing of a claim for latches. And I think that's the proper course to do. I think that's the proper course to do also because of the importance of withdrawal liability to to bolster the underfunded underfunded plans that they have throughout the country. That's an important policy concern. But but your clients behavior really acted directly contrary to that important policy. I was interested to read the briefs that there was a real laissez faire attitude. There's this the statements at the arbitration that, well, you know, if it's under fifty thousand dollars, we don't even send demand letters on those people. I'm thinking this is your this is that one's money. Why? Well, I've never I've never run a pension fund. But if I did, the minute the minute an employer was was subject to withdrawal liability under federal law, I would immediately be demanding. You know, you might need to take a few weeks or months to calculate the numbers. I understand that. But as soon as you can calculate the numbers, why aren't you trying to get all of the money that's owed? Why didn't your client try to get all the money that was owed to the fund? Well, first, first of all, the fifty thousand, that's the minimum. That's a that's a statutory. You don't you don't apply withdrawal liability. Oh, I see. So you're not there's a safe harbor. If it's under 50, they're not even liable for withdrawal. Right. OK. I believe that. I believe that's correct. OK. But but these are cases where there has to be. I'm sorry. What about the delay? I mean, what about the this? Well, we didn't have records. We didn't have computers. We I mean, it seemed very a very cavalier attitude toward pursuing the funds that were duly owed by the employer to the pension fund. Well, it's not until 2003, the fund was not underfunded and they didn't have in place any means set up for going after people. This involves. All right. But that but let me interrupt for a second, because just because the plan is not underfunded. Doesn't mean, does it, that employers who trigger withdrawal liability owe money to the fund? Don't they still? Is it withdrawal liability? Withdrawal liability, regardless of how solvent the fund is or is or is withdrawal liability kick in only if the fund is underfunded? Oh, you don't have withdrawal liability if it's not underfunded. OK, so it has to be underfunded. It has to be underfunded. OK. And there's a significant investigation that you have. So if a company withdraws in 2005 and the fund is not underfunded until 2040, then you send a letter to the employer in 2040 saying now that we're underfunded, we want the withdrawal liability. Is that how that works? No, because there wouldn't be any withdrawal liability until events in 2040. I mean, because there wouldn't there wouldn't have been any underfunding until 2040. All right. So this is not right. It's very helpful to me because I don't think I understood the way the statute worked. What I'm hearing you say is that if a company withdraws in 2005 and let's say it's a big company, a lot of payments were due to the union. And let's say if the plan were underfunded, the withdrawal liability would be a million dollars in 2005. But if the plan's not underfunded, there's zero withdrawal liability. Right, because the withdrawal liability is meant to replace the underfunding, to build the funding of the fund back up to a point where it's not underfunded. OK, so the way the statute works is that if a company wants to get out from under the agreement, you make sure that you leave the scene. You just take a look at whether the plan is funded or not. If the plan is well funded or not underfunded, you leave and you're fine. You skate scot-free. But if you withdraw when the plan is underfunded, then you're going to get hit with withdrawal liability. I mean, we have another client that is underfunded but very close to being funded again. We're basically going to lose that client when they become properly funded because there will be no withdrawal liability claim. Because Congress is just looking for the stability of the fund, not the behavior of the individual employer. Right, what they want is to make sure there's enough money in the fund. Enough money to pay the participants and the beneficiaries when they have valid claims. All right, so then, and I apologize for misunderstanding that, but if you then could educate me on, and us on, when exactly did this fund become underfunded? In 2003. Okay, so if you're underfunded in 2003 and Allied withdrew in either 2005 or 2006, then notice should have been sent within a year or two after that. Well, as soon as practicable is what the statute says. I mean, I understand the arbitrator found it was unreasonable delay. And we're not disputing that, but we're not. It's not something that you do. It's not something you find out overnight. You need to find out that these people are, in fact, out there working nonunion in an area where the collective bargaining agreement applies. Within five years. And that's why Congress chose the flexible language of as soon as practicable as opposed to saying specific date. It understood, presumably. There are problems. But that still creates an outside window, as the arbitrator recognized. It doesn't mean you can endlessly delay sending it. You have to send it as soon as practicable.  I think for policy reasons, though, it should be limited to a defense of latches. If there's been no harm, if there's no harm or prejudice to the employer. That's a fine policy, but that's not what's in the statute is the problem. The statute does not say if causing prejudice that the Congress could write. It doesn't say either way. As soon as practicable. That's that's. So don't we have to live with the words that Congress has given us? I respectfully think that we need to follow what the Supreme Court said. Of course. And I realize it's dicta. So you're not bound by it. But it is it is a defense of latches and latches requires prejudice. And there was a finding of no prejudice. So. No, I'm just I've run out of time. I don't know how I want to preserve my two minutes. You're on our time. OK. Just one question on this, though. In terms of what as soon as practical might mean under this kind of construction exemption to as soon as practical, as I understand it, there's this notion about this kind of five year tail. Right. Do I have this right that that that withdrawal liability can invest if you do work in the area within five years? And so so when we begin to think about what as soon as practical means, could you sit there and say, hi, we're waiting. We've waited four years now. And the reason that we want to wait year five is just to see if they start showing up in doing more work. And so and so what would happen is, is we could be in this circumstance where we'd say, you know, gee, we could maybe run some numbers right now and find out how, you know, how much they owe or how much they don't know. But we don't know that they're still working construction, you know, in a row. So you could make a case that that at least for the construction industry exception, that as soon as practical really doesn't begin until either you see them reworking in the industry within five years or the five year period ends. That's exactly right, because if they start working in the jurisdiction of the CBA after four years and 360 days, they're liable because they didn't make the five years. They're free and clear. So you might have had all the paperwork in the world after three months to tell them, hey, you owe us withdrawal liability. But but but they're in that kind of carve out for construction industry. So so as soon as practical is kind of a, you know, we usually think of this kind of ASAP sort of thing. But in this industry, under this exception, it seems that as soon as practical could mean a time sometime after five years. Certainly. Well, the arbitrator noted that. Right. And said, well, even even if we start the clock at 2010, notifying in 2017 is still seven years later. That's right. But they, you know, they needed to investigate a large number of these cases. I mean, I'm not going to argue that it was unreasonable delay because I obviously we lost that. We lost that in front of the arbitrator. But I think that I think for policy reasons that it should be limited to a defense of latches, not making it just a requirement of unreasonable delay. Thank you. We'll hear your rebuttal after we hear from Mr. Bag. Good morning. May it please the court. Gregory bag on behalf of the appellee. The court is correct. The statute does not mention latches at all. Statutes clear. Bring your claim as soon as practicable. That should end the inquiry. This court need not read into the statute that which does not exist. And that's pretty clear from other precedents about interpreting Arisa unless the Supreme Court did perhaps. Here's and here's my problem with Bay Area. I'm quoting from the opinion. Also, if an employer believes the trustees have failed to comply with their as soon as practicable responsibility, the employer may assert that violation as a latches objection at an arbitration contesting the withdrawal liability assessment. We all know that latches requires prejudice, correct? Correct. Well, if the Supreme Court says you may bring a latches defense and you have to prove prejudice, but you also could simply make a statutory argument to the arbitrator that the notice was not given in a time as soon as practicable. That's a much lighter burden to carry. It's much easier burden to carry. So the court isn't saying what I just in what I just read. You can just satisfy your burden by citing the statute. The court is superimposing a more onerous requirement on the employer. Potentially, I can be read either way, I think. First, the question is, did the fund bring their claim as soon as practicable? And they did not in this case. Second, we all agree on that. Tucker's conceded that as I think he has to. But even if they had the record, the record, you didn't really you didn't have a lot of good arguments, at least as far as I could tell, on the prejudice prong of latches. So speaking only for myself, I think this case comes down to whether or not latches is required. If latches is required, I think you lose. If latches isn't required, I think you win. But I'm trying to get your help as to whether latches is required because I'm having trouble wrapping my mind around the idea that the Supreme Court would say, you can bring this defense, and it's a rather onerous defense because it requires a showing of prejudice. And the Supreme Court says nothing about the opportunity for the employer to bring the easier defense. Understood. I don't think the court really fully explored its part of the decision. And the facts and circumstances are a little bit different in that case. There's a statute of limitations question, right? The question in the Bay Area was, well, when does the statute of limitations begin to run, which the court hadn't answered and was sort of open because you could read that as soon as practicable language is indeterminate. And then the court, I think, you know, logically says, well, this is a flexible standard, not centered on a certain date and not on the notice of withdrawal. What it says is when the demand is set. What's that going to do? It's going to mean that you have a longer tail in the statute of limitations. It's not six years from the notice of withdrawal. It's six years from the demand. And so, well, what happens then if you bring a claim, you know, wait? And the answer is you might be able to serve a claim of a defense of laches. But they didn't have, I suppose one reading is they didn't have occasion to answer the question of, well, what about a case like this where everyone agrees it isn't as soon as practicable? Why are we even talking about the statute of limitations? Why are we talking about a defense to liability? Why aren't we just saying that the predicates of the MVPAA are not satisfied? I mean, arguably, Bay Area just didn't have to confront that. Correct. Well, that's my argument. I suppose the scenario could be the fund did bring their claim as soon as practicable, yet it was still prejudicial to the employer. Because, hypothetically, they don't go to arbitration for, say, another 15 years, right? They bring it as soon as practicable and, say, one year after they withdraw, and then they wait. They wait another 15 years, and you say, well, hold on a moment here. Like, this is prejudicial. Now, it's probably outside of the statute of limitations as well, but suppose it's within the statute of limitations, as soon as practicable, but still prejudicial. Correct. And then you could bring latches. The Bay case deals with a default scenario. There is no statute of limitations for – there's no number. There's no six-year statute of limitations for bringing a withdrawal liability claim. Some courts have looked and said, well, maybe it's something like six years because that's what a Bridger contract claim is, but there is no number for that. So the only language there is is as soon as practicable. And, of course, they haven't met that standard here. They didn't do that. I don't believe that I should have to prove latches, but in case I do, then I think that I've proved prejudice here. But they failed to bring it as soon as practicable. That should end the inquiry. That should be the end of the case. And if that's the case, how could everybody be so wrong? Because I think Mr. Tucker has a valid point that there's unanimity. There isn't apparently a large body of case law, but there is unanimity that latches is to be applied rather than just ending the inquiry after a determination that the notice was not sent as soon as practicable. I think sometimes courts, you know, deal with the case that's before them and whatever might have been argued or not argued in that case, I don't know. The other trick is this, though, is, you know, the Supreme Court in the Bay Area, it's given a bit of dicta, right? It says, oh, hey, you know, you can also do latches. But once it starts giving dicta, it feels like latches is more remote. Wouldn't it have been nice if they would have said, you know what, if it doesn't happen, you've got a lot of defenses. If you don't get the notice as soon as practicable, that's a good defense. If they don't commence the action, you might, you know, in a certain amount of time, that might be a latches defense. They could have walked through everything. They'd already covered some ground on the statute of limitations bound, and so if they're going for completeness, there's just this absence of completeness because they didn't talk about the meaning of as soon as practicable. And so I think a lot of courts are going to read that and say, hey, we've got the classic common law kind of timeliness defenses. They talk for a while about statute of limitations. Then they double around and they cover all their ground. They seal off almost. They give us some advice on latches. That's great. That's really helpful. No mention of as soon as practical. So it's weird for courts to kind of see what looks like a complete opinion, you know, statute of limitations and latches. Say a Supreme Court, when they were surveying the whole landscape, they missed the biggest one right under the nose, the fastest one, the easiest one to prove right under their nose. And so it's dicta, but, wow, that's kind of tough to sit there and say when they're surveying, when they're doing their recon on the landscape, they missed the closest defense. Well, I think the other courts have, too, and the cases are not that many cases that talk about as soon as practicable. It's just hard to say everybody's wrong and they missed the most obvious one. Everybody's wrong is tough, but, you know, we get first crack at it, but it's tough. But then everybody's wrong and they missed the closest one? That's tough, too. So you have to look at the cases, and the body of case law is not that thoroughly well-developed. And to the extent that it is, there's a case in this circuit that says six years is too long. It's just patently unfair. Why aren't there cases? It's because these cases all get resolved at arbitration or pre-arbitration? Well, probably many, many reasons why they don't get to that point, but most importantly because funds don't usually wait 12 years to sue when somebody's withdrawn from a fund. I would assume the dispute is usually about the amount. Did you calculate my liability correctly? Well, outside of the construction, it's pretty clear when there's a withdrawal. The business closes or you cease to contribute, and it's clear. And so the fund acts quickly, and there is no dispute about that fact. It's really the calculation that is, you know. Outside the construction. Outside and others. But in the construction field, Judge Phipps, you would agree with the point he made earlier that there's sort of a five-year waiting period to begin with. Well, we don't know that for real. We really don't know that because there is no collective bargaining agreement in the record, and whether the construction industry exception applies is a function of the collective bargaining agreement itself. It has to have certain provisions in it regarding subcontracting and such, and if those are absent, then the construction industry exception does not apply. Second, there's no evidence at all. There's no witness testified from the fund. There's no document in the record. They didn't testify at all. There's no single trust. They didn't call a single witness. There is no proof that that's what the fund did. I believe they made that up after the fact to try to excuse their delay. You believe they made what up? That their policy was to wait five years to see if the construction industry exception applied. It's not in any of the trust documents. It's not mentioned anywhere. Besides that, even after that, they admit that in October 2011, they were aware that if it applied, that the employer was violating the construction industry exception, and they waited seven years after that to bring the claim. It's inexcusable. Are you in agreement with Mr. Tucker about the primer he was giving me on the way the statute works? If it's under $50,000, there's no liability? There's a formula for a de minimis. There's a formula that the fund has to calculate, and if it's a certain number based on this formula, it's de minimis and it's forgiven. There's no hard number about $50,000. Okay. And then what about, I assume he was correct when he said that there's no withdrawal liability at all if the fund isn't underwater? If at the time, the year before the withdrawal, if the fund is not underfunded according to a formula, then that withdrawing employer owes no withdrawal liability. As to that formula, could it be, and this is just a question about the statute, but could it be that a fund could be underfunded, but one of the employers has fully paid their due, but then they withdraw and then they would still have withdrawal liability? I don't understand the question. So if everyone's paying their due into the multi-employer plan, and the plan is underfunded because, let's say, employers four, five, and six just aren't paying anything. Now, employer one paying exactly what they're scheduled to pay, and they say, hey, we're out. We don't want to do this anymore. Did they, upon withdrawing, then kind of inherit some fractional withdrawal liability for the underfunding that was the result of four, five, and six? Let me see if I can answer the question. So I do this work quite a lot. A plan is underfunded for a multitude of reasons. They are almost always underfunded. They are almost always underfunded. It's a nature of the requirements of the plan. If they become overfunded, they have to increase benefits. So they stay a little underfunded. And they're not underfunded just because employers have not paid their contributions. In fact, I'm not sure that that's really the main reason they're underfunded. The market could go down. It's market. It's calculations. It's a function of collective bargaining and what benefits the trustees or the union has demanded be in the collective bargaining agreement. And as the Court, I'm sure, is aware that there are many, many, many funds that are underfunded, and some that are to the point that they're near failure. So the statute, or this has been around since, I don't know, the 70s or 80s, it's grossly negligent to say that they didn't have any plan or mechanism for determining withdrawal liability and pursuing it until 2005, when that plan's been around for probably close to 100 years, and the statute has required them to have a plan and address withdrawal liability for, you know, half that time. So to say, well, it was never a problem, so we didn't invent the mechanism to address the problem until this time, it's a problem for plans. That's their job to make sure they're funded and to pursue that, and they never had a plan. So, I mean, that's sort of a besides point because we all agree that they waited too long. The question is prejudice, and I think that's obvious. After 12 years, my client said, I have no more records. I don't have anybody who works here anymore who remembers any of this. I don't know what was in the collective bargaining agreement, so that I can argue the construction industry exception did or did not apply. In the meantime, I'm losing my bonding capacity and my line of credit, and he's left to guess, guessing. That's what my client was doing. I don't know. I can't remember. The fund itself doesn't know. But there were remittances. There was a stream of remittances, and then they stopped in, I think, 2006, right? They were never authenticated or put into evidence. They never called a single witness. He says in his brief that we agreed to that. We didn't agree. Were you arguing the remittances were fraudulent documents? I mean, that seems far-fetched. My client was shown the documents in arbitration, so I have no way of authenticating it. He didn't sign them. He didn't fill them out. There's handwriting across the top. We don't know whose handwriting that is where it says no work reports. It appears on their face that they are his documents, but after 12 years, how much can he say about that? That's interesting because latches, we usually think, are there documents available? Not necessarily. Is there a person around who has the personal recollection that they can authenticate what would appear to be the documents available? Some are self-authenticating business records, stuff like this, sometimes. It's an interesting angle on latches. Does your client remember seeing this remittance from 2006? The fund didn't even call a witness to authenticate the documents. I don't know that they had one. The fund, the person responsible for withdrawal liability was the fund lawyer who sued for withdrawal liability, his predecessor. That was, quote, unquote, the person responsible for managing withdrawal liability. There was no person either in testimony at the hearing or pre-discovery that authenticated these documents, said these are actual and complete on either the remittance reports or, more importantly, where is the collective bargaining agreement? It was never identified. The arbitrator himself says we don't know what the collective bargaining agreement is. All we can do is make a guess about when the employer may have stopped contributing. We don't know whether there was a collective bargaining agreement in effect, what it said about the construction industry exception, what it said about termination. Well, the documents, as I recall, indicated that it was either 2005 or 2006, and the numbers in terms of withdrawal liability were more favorable to your client for 2005 than 2006. So I don't know how it could be prejudicial or harmful to your client to pick the more favorable number from 2005. Well, that wouldn't be. But the point is they don't even have the predicate basis for a claim for withdrawal liability when you don't have a collective bargaining agreement, which has never been established. All right. So your fundamental prejudice argument is they tell us we owe several hundred thousand dollars in withdrawal liability. We don't think that's the case. We can't possibly prove our defense once the burden has shifted to us under the statute because we don't even have the collective bargaining agreement and neither do they. Neither do they. Collective bargaining agreements often say things like this agreement has an expiration of X, but unless either party serves notice to terminate it, it continues forever. That's classic in almost every collective bargaining agreement, especially in the construction industry, says that. We don't have the document. We don't know. And that's the measure. When did the contractual obligation to contribute cease? It was never proven. It can't be proven because of the delay. The fund itself doesn't know that, and we don't know that because of the delay. It may still continue. If we had the document, we would know. My client says, I believe. I don't know. It's been a long time. I'm guessing. It shouldn't even be held to that. It's 12 years later. All right. Thank you, Mr. Begg. We'll hear rebuttal from Mr. Tucker. Just very briefly on this collective bargaining agreement. There clearly was a collective bargaining agreement, and they testified to it. I mean, they knew that their remittance reports all show a collective bargaining agreement, but the collective bargaining agreement was submitted as a joint exhibit. It didn't need to be authenticated. They jointly submitted the collective bargaining agreement to the court. A whole series of exhibits were jointly submitted to the court. To the court or the arbitrator? I'm sorry? To the arbitrator. I'm sorry. You're right. I misspoke. To the arbitrator in the arbitration hearing. There were exhibits that were subject. No objection. There was no objection to the submission of these joint exhibits. There's no basis for saying this wasn't a collective bargaining agreement. It was clearly a collective bargaining agreement. They testified about. Otherwise, why would they be making the remittances? Right. But they also testified about the cessation of when they ceased their obligation to contribute. I mean, they testified that it was in 2005. You don't have an obligation to contribute. Right. Exactly. Do you agree with my framing that if laches applies, you win, and if laches doesn't apply, you lose? Yes, unfortunately. But I think it should be laches. And I think clearly prejudice is an element of laches, and there was no prejudice here. Okay. Okay? Thank you very much, counsel. No, we don't. Sorry. We don't do, sir, rebuttals. But thank you very much. We appreciate your arguments. We'll take the matter under advice.